**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**BRADLEY A. GEBHART,**

            **Plaintiff,**

    **v.**                      **Civil Action 2:19-cv-3066**
                                              **Judge George C. Smith**
                                              **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

            **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Bradley A. Gebhart, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that judgment be entered in favor of Defendant.

## I.  BACKGROUND

Plaintiff filed his application for DIB on March 8, 2016, alleging that he was disabled beginning January 28, 2015. (Tr. 344–45). After his application was denied initially and on reconsideration, the Administrative Law Judge (the "ALJ") held a hearing on April 10, 2018. (Tr. 205–37). On August 3, 2018, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 45–66). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–7).

Plaintiff filed the instant case seeking a review of the Appeals Council's decision on July 15, 2019 (Doc. 1), and the Commissioner filed the administrative record on September 23, 2019 (Doc. 9). This matter is now ripe for consideration. (*See* Docs. 10, 14, 15).

In her decision, the ALJ found that Plaintiff last met the insured status requirements of the Social Security Act on September 30, 2015, (Tr. 47), and had not engaged in substantial gainful activity from January 28, 2015, his alleged onset date, through his date last insured. (Tr. 48). She found that Plaintiff suffers from the following severe impairments: fracture of the left hip (iliac wing/acetabulum); degenerative disc disease lumbar spine (mild); depression, anxiety, posttraumatic stress disorder (PTSD); and cognitive/learning disorder. (*Id.*). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As for Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

[T]he claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that the claimant could stand and walk 15 minutes at a time up to two hours in an eight-hour workday and climb ramps and stairs to the same extent while using a straight cane in the right hand when walking more than a few minutes at a time. He could occasionally balance, stoop, kneel, and crouch. He could never climb ladders, ropes, or scaffolds. He could never crawl. He can never push, pull, or operate foot controls with the left lower extremity. He could not work around hazards, such as unprotected heights or exposure to moving mechanical parts, and could not engage in occupational driving. From a mental standpoint, the claimant could perform simple, routine tasks at an average pace without strict time or production demands. He could interact occasionally with coworkers and supervisors but work duties should not require interaction with the general public and any interaction should be limited to the straightforward exchange of information without negotiation, persuasion, or conflict resolution. He could adapt to occasional changes in work duties that were explained.

(Tr. 50–51).

## A. Relevant Hearing Testimony

The ALJ usefully summarized the relevant hearing testimony:

The claimant alleges disability due to chronic pain following a work accident in 2015. The claimant reported limited mobility and anxiety. He reported minimal daily activities. He reported inability to perform chores due to physical limitations in moving, bending, and lifting. He reported social isolation. He could not lift anything, reportedly. He could not squat or bend. He could not stand in one place.

He could not sit more than 15 minutes without moving. He could not climb stairs. He reported difficulty with concentration and memory He had problems with completing tasks (Exhibits 5E, 16E). At the hearing, the claimant testified that could not sit. He had difficulty with standing and walking. He used an electric recliner chair. He shifted positions frequently. He reported left foot numbness. He reported back pain. He reported swelling. He reported using a cane at all times. He could use upper extremities without notable limitation. He endorsed depression and anxiety. He endorsed trauma-related symptoms, such as flashbacks.

(Tr. 51).

## B. Relevant Medical Evidence

The ALJ additionally summarized both the physical and mental health evidence of record.

### 1. Physical Health

During the relevant period, the claimant sustained injuries in a work-related incident in January 2015, the alleged onset date. Per emergency room notes, the claimant was working on a school bus when the jack collapsed and the bus crushed the left side of his body. He complained of left shoulder and hip pain; however, the exam of the spine and lower extremities was largely normal, other than tenderness at the hip and spine and bony tenderness at the left hip, only. Examination of the left upper extremity revealed tenderness, bony tenderness, and swelling but otherwise normal exam of the upper extremities. Imaging and exams revealed crush injury associated with closed left acetabular fracture and closed pelvic fracture (Exhibit lF). He underwent ORIF of the left acetabula/iliac wing. Follow-up imaging showed hardware was intact and unchanged. The fracture healed without evidence of progressive degenerative joint disease (Exhibit 2F). Imaging of the lumbar spine showed spondylolytic defect at L5 with grade 1 spondylolisthesis. There was mild foraminal narrowing at L5/5l (Exhibit 3F). Postoperative notes in February 2015 document improvement. He was doing well and making improvements. He rated pain as mild. His swelling had improved. Sources noted he was doing well postoperatively. In March 2015, the claimant's swelling had resolved. He was working on range of motion of the hip, knee, and ankle. He was doing well postoperatively. He was prescribed a cane at that time, an advancement from the wheelchair he was provided immediately after the injury and surgical intervention. In May, the claimant continued to exhibit progress. The claimant stated he was getting better. He reported a popping in his left hip with certain motions. He rated his pain as mild to moderate. His exam continued to improve related to range of motion and muscle strength, which was 4/5 at that time. Imaging showed that the left acetabulum fracture reduction and alignment was well maintained. The fracture was healed. He underwent physical therapy with objective improvement noted, e.g., increased strength, improved gait, and activities. For example, he reported some worsening after he did a lot of walking over a busy weekend. He utilized a cane but walked with only slightly antalgic gait (Exhibit

5F). A lumbar CT in June showed a subtle vertical lucency projecting over the iliac wing on the left, which could be a mildly displaced iliac wing fracture. However, his exam was fairly benign with no atrophy, intact sensation, intact reflexes, and full strength in the upper extremities. He had full/stable range of motion at the upper extremities. He exhibited stiff, antalgic gait favoring the left lower limb using a straight cane. He had only mild limitation in extension and some limitation with left lateral bending. He had pain along the SI joint at the left. He had full strength of the lower extremities without focal deficits. The source noted that the claimant had come a long way since the initial injury; however, the source noted that the claimant was "unable to return to work in the same capacity as he had prior to the injury, although [the claimant] is eager to do so" (Exhibit 9F/1–2). I give partial weight to this, to the extent that it is consistent with this decision.

However, in July and August, the claimant reported that therapy discharged him due to reaching a therapeutic plateau. He alleged discomfort in the left hip, swelling, numbness and tingling in the left leg and thigh. He reported that water made this worse (i.e., during a shower). The claimant reported that therapy had been helpful and felt that he had improved with therapy. On exam, the claimant walked with a cane and antalgic gait pattern. He tended to strike with his forefoot before his heel on the left side. He had mild swelling along with the left groin. The incision was normal. He had pain with rotation of the hip. He had strong 4–5 strength in the hip. He had strong quadriceps. Imaging was largely normal except showing irregularity of the left acetabulum at the superior dome. Otherwise, imaging was normal with well healed left acetabulum fracture with a step-off at this joint surface. The hip joint itself appeared stable. He seemed to have symptoms stemming from lateral femoral cutaneous nerve and possible neuroma; however, the claimant indicated that he would not have corrective surgery for a neuroma. The source recommended physical therapy as well as aggressive strengthening and range of motion. The source recommended an x-ray guided injection to the left joint as well as referral for physical medicine and rehabilitation. The source noted "no specific restrictions," which is not consistent with a disabling physical impairment (Exhibit 5F, p. 138). Another source reported that the claimant was making steady, if slow, progress. The source was happy with the claimant's progress. The source recommended pursuing more aggressive physical therapy, consistent with the surgeon's recommendation. The claimant also reported a 50% reduction in pain using pain medications. He reported benefit from a TENS unit. Following the hip injection, the claimant reported improvement. He reported diminishment of intense pain. He no longer had tingling in the left lower limb. He ambulated smoothly. He complained of low back and SI joint pain. The exam was consistent with SI joint dysfunction. The source recommended bilateral SI joint injections. It is notable that the claimant indicated that the claimant could ignore his pain if "really involved in work" although the pain remained distracting (Exhibit 9F/7–8). This is not consistent with total disability, generally, and suggests a greater degree of activity at home than he otherwise indicated. The request for SI injections was denied but the claimant reported continued improvement following the prior hip injection and current medication regimen (Exhibit 9F). Subsequent notes after the date last

insured do not support disability prior to that date. His condition remained fairly stable after this date.

(Tr. 52–53).

## 2. Mental Health

Considering the claimant's mental impairments during the relevant period, the claimant received minimal treatment for mental impairments. The claimant was evaluated and treated for mental impairments stemming from his work-related injury. He reported depression and trauma-related symptoms stemming from the accident and physical limitations. The source noted signs of cognitive and physiological symptoms of posttraumatic stress during the exam as well as poor ability to cope and emotional adaptation. He endorsed severe depression on the Beck Depression Inventory-II. The source noted major depressive disorder, single episode, moderate, PTSD, and assigned a GAF of 55, indicative of moderate symptoms and limitations. The source opined the claimant was temporarily and totally disabled based on the work-related injury (Exhibit 4F). While the evidence supports moderate symptoms and limitations, which is consistent with Dr. Benson-Blankenship's GAF score and diagnoses, the evidence does not support total disability (i.e., temporary and total disability). It is noted that the definition of disability under the worker's compensation differs from the definition of disability pursuant to the Social Security Act, which renders the opinions related to disability for purposes of worker's compensation, less persuasive generally. Moreover, the source relied heavily on the claimant's subjective complaints of symptoms and limitations rather than objective evidence; however, the claimant's mental symptoms were exacerbated by other factors, such as losing his job due to physical impairments and physical limitations, generally. While the assessment supports some limitation from the claimant's mental symptoms and impairments, the evidence does not support total disability as suggested. The majority of the claimant's treatment was also after the relevant period, as much of the treatment was after the date last insured. The claimant received treatment primarily through or as part of the claimant's worker's compensation claim. He had some improvement in mental symptoms with this treatment (*see* Exhibits 8F, 20F, 21F). Sources frequently noted no more than mild and moderate limitations in basic work-related functioning despite other sources' offering greater limitations (*e.g.*, marked limitations) or total disability (*see* Exhibits 8F, 15F, 22F).

The claimant received special education services while in school for cognitive disability but was able to graduate (Exhibit IE).

(Tr. 55).

## C. The ALJ's Decision

Upon review of the medical record, the ALJ concluded that "[t]he evidence does not

support the degree of limitation alleged by the claimant pertaining to physical or mental impairments." (Tr. 52).

The ALJ then turned to the opinion evidence. First, she considered the opinion of treating physician, Dr. Haggenjos, who opined that Plaintiff was unable to work and noted disabling physical limitations, including an inability to perform postural activities or work on a regular and continuing basis. (Tr. 53). The ALJ assigned "some weight" to Dr. Haggenjos' sitting limitations because "they appeare[d] to be generally consistent with the ability to perform sedentary work" but "no weight to time off task, absenteeism or extreme postural limits as the doctor fails to point to any evidence to support these limits." (*Id*.). Next, the ALJ assigned "little weight" to the opinion of treating physician, Dr. Oricoli, who opined that Plaintiff could not engage in even sedentary work on a regular and continuing basis. (Tr. 54). She explained that Dr. Oricoli's opinion was not consistent with the record as a whole. (*Id*.).

The ALJ assigned "little weight" to the mental health opinions of Drs. Bensen-Blankenship, Roach, and Rangwani and social worker John Heilmeier, in part, because Plaintiff received most of his mental health treatment after the date last insured. (Tr. 55–56). Finally, the ALJ assigned "partial weight" to the state agency consultants' physical and psychological assessments and incorporated their findings into the residual functional capacity. (Tr. 57).

## II.    STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.   DISCUSSION

Plaintiff argues that the ALJ improperly evaluated the opinion evidence of record. (Doc. 10 at 10–17). Specifically, he asserts that the ALJ did not provide good reasons for discounting the opinions of his treating physicians and that substantial evidence does not support her decision to discount the other mental health opinions. (*Id.*).

Up front, there is a timeline issue with the opinion evidence in this case. Plaintiff alleges that he became disabled when he was injured at work on January 28, 2015, (Tr. 344–45), and it is undisputed that he last met the insured status requirements of the Social Security Act (the "date last insured") on September 30, 2015, (Tr. 47). Generally speaking, a claimant must rely on evidence of disability from before the date last insured to show that he was disabled during the relevant time period. *See Thomas v. Comm'r of Soc. Sec.*, No. 2:18-CV-108, 2019 WL 2414675, at *3 (S.D. Ohio June 7, 2019). Consequently, "[e]vidence of a disability obtained after the date last insured is usually unpersuasive." *Id.* (citing *Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 845 (6th Cir. 2004)). To the extent that evidence from after the date last insured is relevant, it "'must

relate back to the claimant's condition prior to the expiration of [the] date last insured.'" *Thomas*, 2019 WL 2414675, at *3 (quoting *Wirth v. Comm'r of Soc. Sec.*, 87 F. App'x 478, 480 (6th Cir. 2003)).

Here, all but one source issued his or her opinion after the date last insured. Plaintiff's treating physicians, Dr. Haggenjos and Dr. Oricoli, issued their medical source statements in August and September 2017, respectively. (Tr. 956, 960). And all but one of Plaintiff's mental health providers issued their opinions after the date last insured—Dr. Rangwani and Dr. Roach in September 2017, (Tr. 1053–56, 1168–70), and licensed social worker Mr. Heilmeier in November 2017, (Tr. 964–66). Dr. Cheryl Benson-Blankenship, who saw Plaintiff once for a psychological evaluation, issued her opinion before the date last insured. (Tr. 699–704).

The ALJ recognized this chronology. (*See* Tr. 53 (noting that Dr. Haggenjos' opinions "were not signed until August 31, 2017, nearly two years after the date last insured"); Tr. 54 (noting that Dr. Oricoli's opinion "was offered nearly two years after the date last insured with no support that the limitations would relate back to the alleged onset date based on evidence"); Tr. 55–56 (noting that "at the time of Dr. Roach's assessment in September 2017, he had only seem the claimant after the date last insured and while the opinion states the limitations go back to the alleged onset date, the treatment relationship began well after the date last insured"); Tr. 56 (noting that, "[l]ikewise, Mr. Heilmeier did not begin treating the claimant until January 2016, well after the date last insured" and that "[t]he opinion was not signed until November 2017"); *id.* (noting that "Dr. Rangwani's opinions are likewise not consistent with or supported by evidence, particularly given that Dr. Rangwani did not see the claimant until October 2016, more than one year after the date last insured, and his treatment notes were well after the relevant period")).

While the medical opinions from after the date last insured could arguably be said to relate

back to the relevant time period because each concerns prolonged physical and mental health issues stemming from Plaintiff's January 2015 accident, they do not explicitly do so. *See, e.g.*, *Abney v. Astrue*, No. CIV A 507-394-KKC, 2008 WL 2074011, at *7 (E.D. Ky. May 13, 2008) (noting that "[t]he closest any of [the sources] came to [attempting to relate back to the date last insured] is when Dr. Shirazi noted that Plaintiff has allegedly had a history of depression and panic attacks since 1989, and when Wilke-Deaton stated that Plaintiff's depression has been present without relief since 2002" but that "[s]imply reciting a claimant's medical history does not act to relate the claimant's medical condition back to an earlier date such as to opine about his limitations at that earlier point in time"); *see also Thomas*, 2019 WL 2414675, at *3 (internal citation omitted) ("Here, Dr. Chang's medical source is dated nearly one year after Plaintiff's date last insured. Nothing in the record indicates Dr. Chang's medical opinion relates to something before the date last insured. It does not matter Dr. Chang treated Plaintiff previously: anything past the date last insured does not carry weight in a disability determination.").

As the above case law demonstrates, the ALJ properly considered the lapse of time between these sources' opinions and the date last insured. *See, e.g.*, *Schlacter v. Astrue*, No. 1:08CV617, 2012 WL 567609, at *10 (N.D. Ohio Feb. 21, 2012) ("The ALJ did not ignore these opinions, but he reasonably attributed them little weight because of the lapse of time between Plaintiff's date last insured and the rendering of treatment by the doctors and the issuance of their opinions.").

In sum, the ALJ properly considered the fact that all but one of the sources issued his or her opinion years after the date last insured. But the ALJ rejected their opinions for other reasons, too.

### A. Treating Source Opinions

The record contains the opinions of four treating physicians: Dr. Haggenjos and Dr.

Oricoli, who treated Plaintiff's physical symptoms, and Dr. Rangwani and Dr. Roach, who treated Plaintiff's mental health. Plaintiff contends that the ALJ failed to provide good reasons for discounting their opinions. (Doc. 10 at 15–17).

Two related rules govern how an ALJ is required to analyze a treating physician's opinion. *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Closely associated is "the good reasons rule," which requires an ALJ always to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (quoting *Blakely*, 581 F.3d at 406 (alterations in original)); 20 C.F.R. § 404.1527(c)(2). In order to meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937.

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied. The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule.

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The treating physician rule and the good reasons rule together create what has

been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec.*, 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013). As explained below, the ALJ provided good reasons, consistent with the Regulations, for assigning little weight to the opinions of Plaintiff's treating physicians.

### 1. *Physical Health Opinions*

In September 2017, Dr. Haggenjos and Dr. Oricoli completed medical source statements as part of Plaintiff's workers' compensation claim. (Tr. 954–56, 958–60).

Dr. Haggenjos opined that Plaintiff could "rarely" lift one to ten pounds and could never list anything over ten pounds. (Tr. 954). He also opined that Plaintiff could only "occasionally" reach and handle, and finger. (Tr. 954–55). Additionally, Dr. Haggenjos opined that, in an eight-hour workday, Plaintiff could stand for only less than one hour at a time, walk for less than one hour at a time, and sit for six to eight hours at a time. (Tr. 955). Finally, he opined that Plaintiff was likely to miss two more days of work per month due to his condition. (Tr. 956).

Dr. Oricoli, like Dr. Haggenjos, opined that Plaintiff would likely miss two or more days of work per month due to his condition. (Tr. 960). Dr. Oricoli found that Plaintiff was capable of more physical tasks than did Dr. Haggenjos. For example, he found that Plaintiff could "frequently" lift one to five pounds and "frequently" reach, handle, and finger. (Tr. 958–59). But Dr. Oricoli also opined that, in an eight-hour workday, Plaintiff could stand for less than a half-hour total, walk for less than a half-hour total, and sit for less than one hour at a time. (Tr. 959).

It appears from the record that both Dr. Haggenjos and Dr. Oricoli treated Plaintiff at least as early as his alleged onset date, after he was injured at work. (*See* Tr. 876, 920). The ALJ, therefore, recognized that both were longtime treating physicians, (Tr. 54), but declined to afford their opinions controlling weight for several record-based reasons.

First, as discussed, the ALJ noted that both opinions are from two years after the date last insured. (Tr. 53, 54). Second, the ALJ found the opinions inconsistent, both internally and with the record. Specifically, she noted that Dr. Haggenjos' extreme limitations were inconsistent with Plaintiff's documented progress following his accident. (Tr. 53). For example, the ALJ noted that, despite using a cane, Plaintiff "was able to ambulate", "had improvement in strength and range of motion," had, according to imaging results, "healing without hardware failure," "did not require additional surgery," and "reported subjective improvement as well as exhibited objective improvement[.]" (*Id.*). The ALJ found these signs of progress inconsistent with Dr. Haggenjos' extreme limitations. (*Id.*). Additionally, she noted that Dr. Haggenjos' limitations were "not supported by the treatment records from the time period just prior to his date last insured, which all indicate that his fractures were healed and he had full or nearly full range of motion of the back and hips, full or nearly (good 4/5) strength in his lower extremities, and no reported limits that would be expected to impact his upper extremities." (*Id.*).

Similarly, the ALJ noted that Dr. Oricoli's own treatment records and imaging scans "showed improvement" in Plaintiff's pain following joint injections. (Tr. 54). Further, she found that Dr. Oricoli's own opinion contradicted itself because it allowed plaintiff to climb ramps and stairs occasionally, up to a third of the workday, but allowed him to stand or walk for only thirty minutes. (*Id.* (noting that "climbing ramps and stairs is more strenuous than simple standing or walking")).

Because the ALJ found the treating physicians' limitations to be inconsistent with their own treatment notes and Plaintiff's improvement, substantial evidence supports the ALJ's decision to afford their opinions little weight. *See Cottrell v. Comm'r of Soc. Sec.*, No. 2:18-CV-00069, 2019 WL 1723526, at *9 (S.D. Ohio Apr. 18, 2019), *report and recommendation adopted*, No.

2:18-CV-69, 2019 WL 2373581 (S.D. Ohio June 5, 2019) (quoting *Price v. Comm'r of Soc. Sec.*, 342 F. App'x 172, 175–76 (6th Cir. 2009) ("'Where the opinion of a treating physician is not supported by objective evidence or is inconsistent with the other medical evidence in the record, this Court generally will uphold an ALJ's decision to discount that opinion.'")); *see also Morris v. Comm'r of Soc. Sec.*, No. 2:18-cv-374, 2018 WL 6444047, at *5 (holding that "the ALJ was well within his discretion in finding that normal examination findings and documented pain relief did not support treating physician's opined limitations").

Second, the ALJ found that Dr. Haggenjos and Dr. Oricoli failed to support their opinions with objective evidence. (Tr. 53–54). Specifically, she noted that Dr. Haggenjos' manipulative limits did "not appear to relate to any medically determinable impairment[.]" (Tr. 53). She assigned "some weight" to Dr. Haggenjos' sitting limitations as "they appeare[d] to be generally consistent with the ability to perform sedentary work" but gave "no weight" to Dr. Haggenjos' opined "time off task, absenteeism or extreme postural limits as the doctor fails to point to any evidence to support these limits." (*Id.*). Similarly, the ALJ found that, "[l]ike Dr. Haggenjos, [Dr. Oricoli] adopt[ed] limitations that find no support in any severe medically determinable impairment, such as manipulative limits." (Tr. 54).

Substantial evidence also supports this conclusion. Both Dr. Haggenjos' and Dr. Oricoli's opinions are in the form of a "check-the-box" medical source statement. (*See* Tr. 954–56; 958–60). "Many courts have cast doubt on the usefulness of these forms and agree that administrative law judges may properly give little weight to a treating physician's 'check-off form' of functional limitations that did not cite clinical test results, observations, or other objective findings." *Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 566 (6th Cir. 2016) (collecting cases). "These cases recognize that the administrative law judge properly gave a check-box form little weight where

the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence." *Id.*

Here, even where provided the opportunity to elaborate in certain sections, the treating physicians simply listed Plaintiff's diagnoses or stated in conclusory fashion that Plaintiff would have difficulty working. (*See, e.g.*, Tr. 956 (listing diagnoses without further evidence); Tr. 960 (noting that, because of Plaintiff's physical issues after his accident, "increasing his stress" would impact him in "a negative manner")). But "[t]hese remarks [a]re not sufficient to explain [the physicians'] findings." *Ellars*, 647 F. App'x at 566 (noting that, simply listing plaintiff's diagnoses on the physical capacity evaluation failed to support the treating physicians' functional limitations).

Accordingly, the ALJ properly considered the fact that Plaintiff's treating physicians failed to support their opinions. *See, e.g., Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 474 (6th Cir. 2016) (noting that "[w]e have previously declined to give significant weight to rudimentary indications that lack an accompanying explanation" and that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best")).

Lastly, the ALJ properly considered the doctors' specialties or lack thereof. (Tr. 54). She noted that, although Dr. Haggenjos "is a long term treating physician," he "is not a specialist in any particular area." (*Id.*). She then noted that, Dr. Oricoli, on the other hand, specializes "as a pain management physician" and "is a long term treating source." (*Id*). *See* 20 C.F.R. 927(C)(5) ("Specialization. We generally give more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not a specialist.")).

Plaintiff, in challenging the ALJ's assessment of Dr. Haggenjos' and Dr. Oricoli's

opinions, asserts that both doctors "were well aware of the improvement he sustained" and still "provided very similar opinions documenting Mr. Gebhart's limitations." (Doc. 10 at 17). But the similarity of two treating physicians' opinions does not change an ALJ's obligation under the treating physician rule. Nor does it mean that the ALJ erred in assigning partial weight to the opinions of the state agency physicians. (*See id.* at 16 (asserting that the ALJ applied a "more rigorous test[]" to the treating physicians' opinions)). Rather, it is the ALJ's job to resolve conflicts among physicians' opinions. *See Jenkins v. Chater*, 76 F.3d 231, 233 (6th Cir. 1996). And an ALJ is required to afford a treating physician's controlling weight "only if the opinion relies on objective medical findings, . . . and substantial evidence does not contradict it." *See Cottrell*, 2019 WL 1723526, at *9 (quoting *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435, 441 (6th Cir. 2010)). "'If the ALJ finds the treating physician's opinion fails to meet these two conditions, he may discredit that opinion as long as he communicates a reasoned basis for doing so.'" *Cottrell*, 2019 WL 1723526, at *9 (quoting *Coldiron*, 391 F. App'x at 441).

Here, the ALJ discounted the treating physicians' opinions for record-based reasons and communicated his basis for doing so. Plaintiff has failed to set forth any error.

### 2. *Mental Health*

Plaintiff's other two treating physicians, Dr. Rangwani and Dr. Roach, treated Plaintiff's mental health.

Dr. Rangwani completed a medical source statement on September 25, 2017. (Tr. 1168–70). Dr. Rangwani opined that Plaintiff is markedly limited in his ability to socially interact, concentrate, perform, and adapt to a workplace setting. (Tr. 1168–69). He further opined that Plaintiff would likely miss five or more days of work per month due to his mental health condition and that his mental health would likely deteriorate if placed under the stress of full-time

employment. (Tr. 1170). When asked why, Dr. Rangwani wrote simply, "depression." (*Id.*).

Dr. Roach also completed a medical source statement in September 2017. (Tr. 1053–56). On it, he opined that Plaintiff has moderate to marked difficulties in his ability to socially interact, sustain concentration, and adapt to a workplace setting. (Tr. 1053). He further opined that Plaintiff would likely miss five or more days of work due to his condition and that his condition would likely deteriorate if placed under the stress of full-time employment. (Tr. 1055). In sum, Dr. Roach concluded:

> The evaluation finds the mental health diagnosis of Major Depressive Disorder, Single Episode, Moderate, (ICD-10:F32.1) as a direct and proximate consequence of the industrial accident. The Injured Worker is temporarily and totally disabled as a result of this condition. The alleged psychological symptoms prevent [him] from returning to his former occupation. His psychological symptoms that are work prohibitive include sadness, very reduced motivation, irritable mood, agitation, insomnia, loss of self-esteem, and reduced concentration.

(Tr. 1056).

The ALJ assigned "little weight" to both opinions. (Tr. 55–56). First, as discussed, the ALJ noted that both doctors issued their opinions roughly two years after the date last insured. (Tr. 55). Specifically, "at the time of Dr. Roach's assessment in September 2017, he had only seen the claimant after the date last insured and while the opinion states the limitations go back to the alleged onset date, the treatment relationship began well after the date last insured." (Tr. 55–56). Similarly, the ALJ noted that "Dr. Rangwani did not see the claimant until October 2016, more than one year after the date last insured, and his treatment notes were well after the relevant period." (Tr. 56). The Sixth Circuit has held that a treating physician's opinion, based on a treatment record that began months after the date last insured, was not entitled to substantial weight. *Schlacter v. Astrue*, No. 1:08CV617, 2012 WL 567609, at *9 (N.D. Ohio Feb. 21, 2012) (citing *Siterlet v. Sec'y of Health and Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). This is

because treating physicians that begin treating a claimant well after the date last insured "lack[] firsthand knowledge of [the claimant's] condition prior to [that time]." *Schlacter*, 2012 WL 567609, at *9.

Additionally, the ALJ found that Dr. Rangwani's and Dr. Roach's opinions were inconsistent with the mental health evidence of record. She noted that Dr. Rangwani's treatment notes "do not support the degree of limitation noted by [his] opinions, which note marked limitations." (Tr. 56 (citing Tr. 1057–85)). Specifically, Plaintiff "did not exhibit notable cognitive limitations" and "tried to keep busy during the day." (Tr. 56). Moreover, Plaintiff had "fairly normal mental status exams other than mood symptoms." (*Id.*). Similarly, while the ALJ found that Dr. Roach's opinion "support[s] some limitations in mental functioning, [] which have been considered and incorporated into the residual functional capacity above," his opinion is "inconsistent from treatment records, which note moderate limitations and improvement with treatment." (*Id.* (citing Tr. 1086–95, 1096–1167)). Given the ALJ's opinion, Plaintiff's assertion that `"the ALJ made no effort to point to the evidence that was supposedly inconsistent" with the opinions is without weight. (*See* Doc. 10 at 13).

In sum, the ALJ provided good reasons for assigning less than controlling weight to the opinions of Plaintiff's mental health treating physicians.

### B. Non-Treating Source Opinions

Next, Plaintiff asserts that the ALJ improperly evaluated the opinions of Dr. Benson-Blankenship and Mr. Heilmeier, each of whom opined on Plaintiff's mental health. (Doc. 10 at 10–15).

### 1. Dr. Benson-Blankenship

On July 29, 2015, Dr. Cheryl Benson-Blankenship performed a psychological evaluation

of Plaintiff. (Tr. 699–704). She opined that Plaintiff's memory is mildly impacted by fatigue, chronic pain, and depression. (Tr. 701). She also noted that Plaintiff's flashback and post-traumatic stress disorder ("PTSD") symptoms serve as a barrier to his emotional well-being. (*Id*.). Following her evaluation of Plaintiff, Dr. Benson-Blankenship diagnosed Plaintiff with a major depressive order and PTSD. (Tr. 702). She noted that his mental health issues are a direct result of his work injury and that he is totally disabled. (Tr. 704). She concluded that he is "emotionally devastated" by the workplace injury and "has difficulty looking beyond the physical limitations that have been generated for him." (*Id*.).

The ALJ assigned "little weight" to Dr. Benson-Blankenship's opinion. (Tr. 55). In doing so, the ALJ first noted that the meaning of "disability" is different for purposes of evaluating social security claims and workers' compensation claims. (Tr. 55). Further, the ALJ noted that Dr. Benson-Blankenship "relied heavily" on Plaintiff's "subjective complaints of symptoms and limitations rather than objective evidence" and that Plaintiff's "mental symptoms were exacerbated" by situational factors, including, for example, "losing his job due to physical impairments and physical limitations, generally." (*Id*.). The ALJ noted that Dr. Benson-Blankenship's assessment "supports some limitation" from Plaintiff's mental symptoms but that "the evidence does not support total disability as suggested." (*Id*.). Further, the ALJ noted that Plaintiff received the majority of his treatment after the date last insured. (*Id*.). She noted, too, that "[h]e had some improvement in mental symptoms with his treatment," (citing Tr. 914–19, 1057–85, 1086–95), and that "[s]ources frequently noted no more than mild and moderate limitations in basic work-related functioning," (Tr. 55).

The Undersigned finds that the ALJ's explanation regarding Dr. Benson-Blankenship's opinion is supported by substantial evidence. Despite there being no reasons-giving requirement

for non-treating source opinions, *see Martin*, 658 F. App'x at 259, the ALJ still considered the relevant regulatory factors and explained her basis for rejecting the opinion.

### 2. Mr. Heilmeier

Licensed social worker John Heilmeier saw Plaintiff for over ten one-hour sessions. (*See* Tr. 1086). On November 14, 2017, he completed a medical source statement. (Tr. 964–66). On it, he opined that Plaintiff is moderately limited in most functional areas but markedly limited in coordinating with others, performing at expected production levels, and dealing with normal stressors. (*Id.*). He, like Dr. Roach and Dr. Rangwani, opined that Plaintiff's condition would likely deteriorate under the pressure of full-time work and that he would miss more than five days of work per month due to his mental health. (Tr. 966).

Mr. Heilmeier, a licensed social worker, is not an "acceptable medical source" pursuant to Social Security Ruling SSR 06-03 P (the "Ruling"); instead, he is an "other source." *See* SSR 06-03P (S.S.A.), 2006 WL 2329939, at *2.[1] "Other sources" cannot establish the existence of a medically determinable impairment but "may provide insight into the severity of the impairment and how it affects the individual's ability to function." *Id.* The Ruling notes that these opinions are "important" and should be evaluated by using the applicable factors, including how long the source has known the individual, how consistent the opinion is with other evidence, and how well the source explains the opinion. *Id.* at *4–5. ALJs may also consider the degree to which the source presents relevant evidence to support the opinion, whether the source has a particular expertise, and "any other factor supporting or refuting the opinion." *Davila v. Comm'r of Soc. Sec.*, 993 F. Supp. 2d 737, 757–58 (N.D. Ohio 2014) (internal quotation marks and citations omitted).

---

[1] This regulation has been rescinded. It still applies, however, to claims (like this one) filed before March 27, 2017. 20 CFR § 404.1527.

The ALJ assigned "little weight" to Mr. Heilmeier's opinion for several reasons. First, as explained, the ALJ noted that Mr. Heilmeier, like most of the sources of record, did not issue his opinion until after the date last insured. (Tr. 56). Moreover, the ALJ noted that "Mr. Heilmeier did not begin treating [Plaintiff] until after January 2016, well after the date last insured." (*Id.*). While Plaintiff asserts that Mr. Heilmeier's opinion is pertinent to the relevant time period, (*see* Doc. 10 at 13–14), the ALJ properly considered the fact that Mr. Heilmeier did not start treating Plaintiff until January 2016, (*see supra* at 16–17).

Second, the ALJ discounted Mr. Heilmeier's opinion because she found it conflicted with his own treatment notes. Specifically, his "own treatment records document only mild to moderate or moderate limitations in 2016, which is not consistent with the subsequent opinion of marked limitations in several areas of mental functioning." (Tr. 56 (citing Tr. 914–19)). Third, the ALJ found that "it [was] notable that out of 17 categories, Mr. Heilmeier noted only three marked limitations with the other areas marked between none and mostly moderate limitations, which is not entirely consistent with the total disability, generally, but also overstates the claimant's limitations in light of objective evidence, as noted here." (*Id.*).

Plaintiff, in challenging the ALJ's conclusion, states that, because Mr. Heilmeier's opinion, along with the other mental health opinions, "corroborate" Dr. Benson-Blankenship's opinion, which was issued before the date last insured, the ALJ was required to adopt those opinions. (Doc. 10 at 13). According to Plaintiff, "[t]he only way the ALJ's position could be considered correct, or supported by substantial evidence, is if there was evidence that [his] condition had worsened since the date last insured has expired." (*Id.*). Plaintiff's argument misses the mark.

To start, it is the ALJ's job to resolve conflicts in the evidence. *See Jenkins*, 76 F.3d at 233. And the ALJ did this by comparing the significant limitations from the opinions with the

evidence in the record.  She also weighed the opinion evidence using relevant regulatory factors. The fact that the Plaintiff's mental health providers reached similarly restrictive opinions does not mean that the ALJ was required to adopt them or assign them controlling weight.  To the contrary, the ALJ was not even required to give good reasons for discounting the opinions of Dr. Roach and Mr. Heilmeier.  At base, Plaintiff demands more than the Regulations require, and he has shown no reversible error.

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Statement of Errors (Doc. 10) be **OVERRULED** and that judgment be entered in favor of Defendant.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of

the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:   February 26, 2020                    /s/ Kimberly A. Jolson
                                             KIMBERLY A. JOLSON
                                             UNITED STATES MAGISTRATE JUDGE